IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-50570

_____

MARSHALL CONTRACTORS, INC.,

Plaintiff-Appellant,

versus

AMWEST SURETY INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
For the Western District of Texas, Austin Division
(A-95-CV-145)

_____

April 24, 1997

Before REYNALDO G. GARZA, HIGGINBOTHAM, and JONES, Circuit Judges.

PER CURIAM:[*]

This case presents the remnants of a dispute over construction at the University of Texas's Balcones Research Center. Marshall Contractors was the general contractor for the construction of a high-tech "clean room" for scientific research. Marshall subcontracted work on "high-purity piping" to Integrated Gas Systems. It paid monthly requisitions as requested by IGS from the spring of 1992 until the end of the year, and IGS used these funds

_____

[*]Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

to pay its suppliers. But in January of 1993, IGS refused to pay a $76,674.60 bill to one of its suppliers, SnyderGeneral, because of Snyder's inadequate work. Marshall initially told IGS that it was going to pay Snyder directly and deduct the amount from the next month's requisition payment to IGS. But then Marshall decided to withhold the entire $259,224 in IGS's February requisition and to demand that IGS settle its dispute with Snyder. IGS never resolved its dispute, never received the February requisition from Marshall, abandoned the project on February 25, and eventually went out of business. Marshall signed up a new subcontractor and finished the project.

IGS sued Marshall and Marshall's surety, Aetna. Marshall counterclaimed and brought in IGS's surety, Amwest, as a third-party defendant. The jury found that IGS breached the Marshall-IGS contract and that Marshall did not breach it. But it also found that IGS's breach caused no damages to Marshall. The district court entered a take-nothing judgment against IGS.

This case between Marshall and Amwest remains because the district court severed it from the original lawsuit when Marshall tried to amend its complaint to add bad-faith and tortious-interference claims against Amwest. Amwest issued a performance bond and a payment bond in August of 1992 to guarantee that IGS would pay its subcontractors and suppliers and generally perform its obligations to Marshall. The contract between Marshall and IGS

2

included a provision — paragraph 8.4 — that Marshall claims created a duty of good faith on the part of Amwest:

> In the event that any action, suit, proceeding, claim or demand is made against the Contractor, its surety, officers, directors, agents, representatives, employees, successors or assigns against which the Subcontractor has herein agreed to indemnify the Contractor, then the Contractor may withhold from any payment due or hereafter to become due to the Subcontractor hereunder, an amount sufficient in its sole judgement [sic] to protect and indemnify it from such action, suit, proceeding, claim or demand, together with legal fees and disbursements. . . . The Contractor will release any payments due to the Subcontractor upon receipt of written acknowledgment of the action, suit, proceeding, claim or demand from the Subcontractor's Surety stating its intention to indemnify the Contractor and protect the Contractor as set forth above.

According to Marshall, it learned in February of 1993 that IGS had failed to pay several suppliers. It notified Amwest, which acknowledged IGS's outstanding debts. Amwest did not provide assurances of payment to Marshall, so Marshall refused to pay IGS. After IGS abandoned the project, Marshall requested Amwest to arrange for substitute performance, but Amwest refused. Instead, Amwest helped contest Marshall's suit by paying IGS's attorneys' fees. The district court granted summary judgment to Amwest on both the bad-faith and the tortious-interference claims.

We agree with the district court that Marshall has not created a genuine issue of material fact on its bad-faith claim. In Great American Ins. Co. v. North Austin Mun. Utility Dist. #1, 908 S.W.2d 415, 418-20 (Tex. 1995), the Texas Supreme Court established the general rule that sureties do not owe a duty of good faith and fair

3

dealing to their bond obligees.  The Great American court rested much of its reasoning on the existence of Tex. Bus. & Com. Code § 34.02, which permits sureties to require an obligee to sue on the contract before claiming payment from the surety.  This feature of a suretyship relationship makes it different from the relationship between insurer and insured.  "The derivative nature of a surety's liability and its right to rely upon the defenses of its principal compel the conclusion that a surety, like its principal, should be entitled to test the merits of an obligee's claim without the imposition of extracontractual duties to the bond obligee."  908 S.W.2d at 420.  We followed the Great American rule in Tacon Mechanical Contractors v. Aetna Cas. & Sur. Co., 65 F.3d 486, 488 (5th Cir. 1995).  In the absence of a contractual relationship creating a duty of good faith and fair dealing, these cases control the outcome here.

Marshall attempts to distinguish this case from Great American by arguing that paragraph 8.4 of the Marshall-IGS contract, incorporated into the suretyship agreement, imposes special duties on Amwest.  But the language in paragraph 8.4, as modified by the Marshall-IGS subcontract, imposes a duty on Marshall, not on Amwest.  It states that Marshall must release payments to IGS if Amwest declares that it will indemnify Marshall.  It does not require Amwest to make such a declaration.

Marshall states repeatedly that there is something "predatory" about the fact that Amwest funded IGS's suit against Marshall.  In

4

the absence of a duty of good faith and fair dealing, however, we cannot say that Amwest did anything wrong. Although unsuccessful, IGS's suit survived summary judgment. And Amwest, as it turns out, had good reason not to pay Marshall: the jury found that Marshall had no damages from IGS's breach of contract. The suretyship agreement gave Amwest the obligation to pay on IGS's behalf once Marshall established liability. Under Texas law, it did not prevent Amwest from supporting litigation that could — and did — establish that IGS was not liable after all. Cf. L&A Contracting Co. v. Southern Concrete Services, 17 F.3d 106, 111 (5th Cir. 1994) (Florida law) ("After a declaration of default, the relationship changes dramatically, and the surety owes immediate duties to the obligee.").

Marshall's claim for tortious interference with the Marshall-IGS subcontract fares no better than its claim for bad faith. In Tacon Mechanical, we held that, after Great American, bond obligees may not sue their sureties for tortious interference when the claim "merely reiterates the bad faith claim." 65 F.3d at 488. We also noted that "there is no Texas authority applying a tortious interference claim in a surety context." Id. Marshall's theory is different from the theory in Tacon Mechanical because Amwest allegedly helped fund IGS's litigation with Marshall. Nevertheless, the tortious-interference claim is really nothing more than a recapitulation of the good-faith claim in a different key, and Tacon Mechanical understands Texas law to forbid that.

5

Furthermore, because <u>Great American</u> establishes a contract theory as the only way a bond obligee can recover from a surety that fails to pay, Marshall must look beyond the contract to find a tort duty on which to ground its tort theory. Texas law does not impose an abstract tort duty not to harm one party in litigation by contributing money to its opponent.

AFFIRMED.